97 F.3d 689
 Robert BERY, James Albert Harris, Anne Reiss, Ricardo
Antonio Pascual, Artists for Creative Expression on the
Sidewalks of New York City, Robert Lederman, Jodi Bogus,
Knut Masco, Alexis Portilla and Arthur Robins, Plaintiffs-Appellants,
v.
CITY OF NEW YORK; Rudolph Giuliani, Mayor, City of New
York; William Bratton, Chief, New York City Police
Department; Robert Morgenthau, District Attorney-New York
County; Richard A. Brown, District Attorney-Queens County;
William L. Murphy, District Attorney-Richmond County;
Charles H. Hynes, District Attorney-Kings County; Robert F.
Johnson, District Attorney-Bronx County; Alfred C. Cerullo,
III, Commissioner of New York City Department of Consumer
Affairs; New York City Department of Consumer Affairs;
Henry J. Stern, Commissioner, New York City Department of
Parks & Recreation; Marilyn Gelber, Commissioner of the New
York City Department of Environmental Protection of the City
of New York; Environmental Control Board of the City of New
York and Anne J. McCarthy, Executive Director of the
Environmental Control Board of the City of New York, in her
individual and official capacities, Defendants-Appellees.
 Nos. 1620, 1621 and 1782, Dockets 95-9089(L), 95-9131 and 96-7137.
 United States Court of Appeals,
Second Circuit.
 Argued April 26, 1996.
Decided Oct. 10, 1996.
 
 1
 Noah A. Kinigstein, New York City, Carol Novack, New York City, for Bery Plaintiffs-Appellants.
 
 
 2
 Wayne A. Cross, New York City (Randall M. Fox, New York City, Dewey Ballantine, New York City ), for Lederman Plaintiffs-Appellants.
 
 
 3
 Elizabeth I. Freedman, New York City (Paul A. Crotty, New York City, Corporation Counsel of the City of New York, Leonard Koerner, Robin Binder, Assistant Corporation Counsel), for Defendants-Appellees City of New York.
 
 
 4
 (Marjorie Heins, Arthur Eisenberg, New York City, for Amici Curiae American Civil Liberties Union, New York Civil Liberties Union, The New York Foundation for the Arts and The New York City Arts Coalition.)
 
 
 5
 (Gloria C. Phares, Geoffrey L. Thomas, Marc E. Kenny, Paul, Hastings, Janofsky & Walker, New York City, for Amici Curiae Chuck Close, Ronald Feldman, David Hammons, Hans Haacke, Jenny Holzer, Lucy Lippard, Claes Oldenburg, Irving Sandler, Simon Schama, Coosje Van Bruggen, The College Art Association, The Museum of Modern Art and The Whitney Museum of American Art.)
 
 
 6
 (Shelly S. Friedman, Irving J. Gotbaum, Scott E. Goldsmith, Freedman & Gotbaum, New York City, for Amici Curiae The Fifth Avenue Association, Inc., The Alliance for Downtown New York, Inc., The Grand Central Partnership, Inc., The 34th Street Partnership, Inc., The Madison Avenue Business Improvement District and The Soho Alliance.)
 
 
 7
 Before VAN GRAAFEILAND and MAHONEY, Circuit Judges, and CARTER, District Judge.[1]
 
 ROBERT L. CARTER, District Judge:
 
 8
 Appellants Robert Bery et al. (94 Civ. 4253) and Robert Lederman et al. (94 Civ. 7216), in separate actions below, sought by motions for a preliminary injunction to enjoin enforcement of the General Vendors Law, § 20-452 et seq. of the Administrative Code of the City of New York ("General Vendors Law"), which bars visual artists from exhibiting, selling or offering their work for sale in public places in New York City without first obtaining a general vendors license. Appellees City of New York and various municipal bodies and officials charged with administration and enforcement of the General Vendors Law ("the City") opposed the motions. The district court denied the motions; both sets of appellants appeal.
 
 Background
 
 9
 Appellants are individual artists engaged in painting, photography and sculpture and an artists' advocacy organization, Artists for Creative Expression on the Sidewalks of New York. The individual artists have been arrested, threatened with arrest or harassed by law enforcement officials for attempting to display and sell their creations in public spaces in the City without a general vendors license. Some have had their art work confiscated and damaged. At least one asserts a desire to sell and display her art on the sidewalks of New York but has not done so for fear of arrest and destruction of her work.
 
 
 10
 The Bery appellants commenced their action on June 9, 1994, with the filing of a summons and complaint. The Lederman complaint was filed on October 5, 1994. Both sets of plaintiffs subsequently moved for a temporary restraining order and preliminary injunction. On October 24, 1995, the district court issued its memorandum and order jointly denying the motions for preliminary injunction in both actions, and on October 26, 1995, filed an amended opinion reported at 906 F.Supp. 163. By order of this court dated December 13, 1995, the actions were consolidated on appeal.
 
 
 11
 The General Vendors Law contains regulatory provisions concerning the sale or offering for sale of non-food goods and services in public spaces in the City of New York. Pursuant to § 20-452(b) of the Administrative Code of the City of New York ("Administrative Code"), a person who "hawks, peddles, sells, leases or offers to sell or lease, at retail, [non-food] goods or services ... in a public space" is a general vendor. Public space is defined as "[a]ll publicly owned property between the property lines on a street as such property lines are shown on the City Record including ... a park, plaza, roadway, shoulder, tree space, sidewalk or parking space between such property lines .... [as well as] publicly owned or leased land, buildings, piers, wharfs, stadiums and terminals." Administrative Code § 20-452(d).
 
 
 12
 At issue in the present case is § 20-453 of the General Vendors Law, a provision which initially required a license for all general vendors who sought to sell non-food goods or services in public spaces in the City. In 1982, Local Law 33 was enacted amending § 20-453 to exempt from the licensing requirement vendors of newspapers, books and other written matter. L.L. 33/1982. In enacting the amendment, the City Council described the new provision as consonant with the "principles of free speech and freedom of the press." Id. at § 1. In 1979, § 20-459(a) of the Administrative Code was amended by Local Law 50 to limit the total number of licenses in effect at any given time to the number of licenses in effect on September 1, 1979. L.L. 50/1979. The number at that time was 853. However, that limitation rests on a slippery slope, since any veteran who qualifies for a vending license must be issued one. New York State General Business Law § 32 (McKinney 1994). As of the present, 340 such licenses over and above the 853 cut-off number have been issued to veterans, making a total of 1,193 general vendors licenses in effect.
 
 
 13
 Violators of the licensing requirement are guilty of a misdemeanor punishable by fine and/or imprisonment and civil penalties. See Administrative Code § 20-472(a) and (c)(1). If criminally convicted, the violator is subject to a fine of not less than $250 nor more than $1000 and/or imprisonment of up to three months. Administrative Code § 20-472(a). If found civilly liable, the violator may be fined not less than $250 nor more than $1000, together with a fine of $250 for each day of the unlicensed activity. Administrative Code § 20-472(c)(1). In addition, police officers are authorized to seize the items being sold and the seized items are subject to forfeiture. Administrative Code §§ 20-468 and 20-472(a).
 
 
 14
 Administrative Code §§ 20-465(a), (b), (e), (f), (k), (m), (n), and (q) restrict the placement, location and size of vending displays and prohibit vending where an authorized city employee has given notice that exigent circumstances require the vendor to move. These regulations are applicable to all general vendors, including vendors of exclusively written matter. Vending, except for written matter, in a park is barred without written authorization from the Department of Parks and Recreation, Administrative Code § 20-465(j); it is also banned from certain commercial zoning districts and in a delineated section of midtown Manhattan. Administrative Code § 20-465(g).
 
 District Court's Determination
 
 15
 The district court denied appellants' motions for preliminary injunctions, dealing with both motions in a joint decision issued in amended form on October 26, 1995. See Bery v. City of New York, 906 F.Supp. 163 (S.D.N.Y.1995) (Cedarbaum, J.). The court ruled that the General Vendors Law was a content-neutral municipal ordinance of general application which violated neither the First nor the Fourteenth Amendment, although its incidental effect was to restrict the sale of art on the sidewalks of New York. The limitation of 853 licenses in effect at a given time, a waiting list of between 500 and 5,000 applicants, a waiting time of between 3-5 years to secure a license[2] and the absence of any of the appellants' names on the waiting list did not cause the court to modify this conclusion.
 
 
 16
 Stating that "[t]he precise nature of First Amendment protection for painting and sculpture with no verbal elements has not been addressed by the federal courts," the district court likened appellants' "fine art" to "applied or decorative art" and found that it rated only limited constitutional protection, in the absence of evidence of government censorship. The court found neither censorship nor animus towards artists as a motivation behind the enactment of the ordinance by the City Council. It thus deemed the ordinance content-neutral and subjected it to a more lenient level of scrutiny than would have been required had it been content-based. Id. at 168.
 
 
 17
 Applying the standard enunciated in United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968), the court found the provision furthered a public interest unrelated to the suppression of free speech that would be achieved less effectively absent the regulation. Id. The prohibition on the sale of art on the streets without a general vendors license, the court found, was appropriately designed to deal with the problem of street congestion. Id. The court did not address the question of whether alternative channels of expression remained open to appellants.
 
 
 18
 The court reasoned that words expressing "political or religious views are much closer to the heartland of First Amendment protection of 'speech' than the apolitical paintings in these cases." Id. at 169. Based on this premise, the court found the City's exemption of the sellers of written matter from the licensing requirement a rational determination consonant with the requisites of the Equal Protection Clause of the Fourteenth Amendment. Id. at 170. Thus, the court denied appellants' motions for a preliminary injunction on both First Amendment and Equal Protection grounds. Id.
 
 Standards
 
 19
 This court reviews the district court's denial of appellants' preliminary injunction motions with an abuse of discretion standard. Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir.1990). "An abuse of discretion exists when the district court has made an error of law or of fact." Id. (citations omitted). In the present case, since appellants seek vindication of rights protected under the First Amendment, we are required to make an independent examination of the record as a whole without deference to the factual findings of the trial court. Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, --- U.S. ----, ----, 115 S.Ct. 2338, 2344, 132 L.Ed.2d 487 (1995). Such a "fresh examination of crucial facts" is necessary even in the face of the "clearly erroneous" standard of factual review set forth in Rule 52(a), F.R.Civ.P. Hurley, --- U.S. at ----, 115 S.Ct. at 2344.
 
 
 20
 In order to justify the award of a preliminary injunction, the moving party must first demonstrate that it is likely to suffer irreparable harm in the absence of the requested relief. Sperry Int'l Trade, Inc. v. Government of Israel, 670 F.2d 8, 11 (2d Cir.1982). Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction. See, e.g., Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); 11A Charles A. Wright, Arthur R. Miller and Mary Kane, Federal Practice and Procedure, § 2948.1 at 161 (2d ed. 1995) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"). By the very nature of their allegations, then, appellants have met the first prong of the test.
 
 
 21
 Ordinarily, the movant then has two options: it must either demonstrate a likelihood of success on the merits or it must raise "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Sperry Int'l Trade, Inc., 670 F.2d at 11, citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). However, in a case in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard. Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989).
 
 Discussion
 I.
 
 22
 Initially, we note that the district court's view of the reach of the First Amendment is more restricted than the jurisprudence warrants. The First Amendment shields more than political speech and verbal expression; its protections extend to entertainment, Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948); film, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02, 72 S.Ct. 777, 780-81, 96 L.Ed. 1098 (1952); theater, Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); music, without regard to words, Ward v. Rock Against Racism, 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); peaceful marches to express grievances to governmental authorities, Gregory v. Chicago, 394 U.S. 111, 112, 89 S.Ct. 946, 947, 22 L.Ed.2d 134 (1969), Shuttlesworth v. Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); sit-ins by blacks to protest racial discrimination, Brown v. Louisiana, 383 U.S. 131, 141-42, 86 S.Ct. 719, 723-24, 15 L.Ed.2d 637 (1966); the wearing of black arm bands to evidence disapproval of our involvement in Vietnam, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969); the refusal to salute the flag as part of a regularized school activity, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943); and most recently, parades with or without banners or written messages, Hurley, --- U.S. at ----, 115 S.Ct. at 2345. "[T]he Constitution looks beyond written or spoken words as mediums of expression." Hurley, --- U.S. at ----, 115 S.Ct. at 2345. If the First Amendment reached only "expressions conveying a 'particularized message,' " its "protection would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schonberg, or Jabberwocky verse of Lewis Carroll." Id. at ----, 115 S.Ct. at 2345 (quoting from Spence v. Washington, 418 U.S. 405, 411, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (per curiam)).
 
 
 23
 The First Amendment has surely been valued as essential to the preservation of a political democracy in this country; thus, even the pamphleteer espousing political sedition has been shielded from governmental suppression. See, e.g., Whitney v. California, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("even advocacy of violation [of the law], however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on"). The First Amendment's fundamental purpose, however, is to protect all forms of peaceful expression in all of its myriad manifestations. Abood v. Detroit Board of Education, 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977) ("[i]t is no doubt true that a central purpose of the First Amendment ' "was to protect the free discussion of governmental affairs." ' (citations omitted). But our cases have never suggested that expression about philosophical, social, artistic, economic, literary or ethical matters ... is not entitled to full First Amendment protection") (footnote omitted). See also Joseph Burstyn, Inc., 343 U.S. at 501, 72 S.Ct. at 790 (motion pictures are fully protected expression that "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression").
 
 
 24
 The district court viewed the First Amendment's primary function as safeguarding the free flow of political and religious views, and hence felt sanguine about the ordinance's interference with appellants' "wish to sell their apolitical paintings." Bery, 906 F.Supp. at 170. The City apparently looks upon visual art as mere "merchandise" lacking in communicative concepts or ideas. Both the court and the City demonstrate an unduly restricted view of the First Amendment and of visual art itself. Such myopic vision not only overlooks case law central to First Amendment jurisprudence but fundamentally misperceives the essence of visual communication and artistic expression. Visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection.[3] Indeed, written language is far more constricting because of its many variants--English, Japanese, Arabic, Hebrew, Wolof,[4] Guarani,[5] etc.--among and within each group and because some within each language group are illiterate and cannot comprehend their own written language. The ideas and concepts embodied in visual art have the power to transcend these language limitations and reach beyond a particular language group to both the educated and the illiterate. As the Supreme Court has reminded us, visual images are "a primitive but effective way of communicating ideas ... a short cut from mind to mind." West Virginia State Board of Education, 319 U.S. at 632, 63 S.Ct. at 1182. Visual images and symbols, for example, are used in the Third World so that individuals who are unable to read may readily recognize the party or candidate they wish to vote for. One cannot look at Winslow Homer's paintings on the Civil War without seeing, in his depictions of the boredom and hardship of the individual soldier, expressions of anti-war sentiments, the idea that war is not heroic.
 
 
 25
 Furthermore, written and visual expression do not always allow for neat separation: words may form part of a work of art, and images may convey messages and stories. As appellants point out, Chinese characters are both narrative and pictorial representations. Nahuatl, a language used by Aztec peoples in Central America, also incorporates pictures in its written language. Visual artwork is as much an embodiment of the artist's expression as is a written text, and the two cannot always be readily distinguished.
 
 
 26
 The City argues that appellants' "expression" allegedly impinged by the Regulation is not in fact their art, but their peddling of the art. It argues that the sale of art is conduct, and in order to be constitutionally protected, the sale of protected material must be "inseparably intertwined with a 'particularized message.' " Young v. New York City Transit Authority, 903 F.2d 146, 153 (2d Cir.), quoting Spence, 418 U.S. at 410-11, 94 S.Ct. at 2730-31, cert. denied, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). The City further argues that appellants are free to display their artwork publicly without a license, they simply cannot sell it.
 
 
 27
 These arguments must fail. The sale of protected materials is also protected. See Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 756 n. 5 & 768, 108 S.Ct. 2138, 2143 n. 5 & 2150, 100 L.Ed.2d 771 (1988) . "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." Riley v. Nat'l Fed'n of Blind of North Carolina, 487 U.S. 781, 801, 108 S.Ct. 2667, 2680, 101 L.Ed.2d 669 (1988). In United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the United States Supreme Court found that a ban on honoraria for government employees "imposes the kind of burden that abridges speech under the First Amendment," in part because "the denial of compensation for lower-paid, nonpolicymaking employees will inevitably diminish their expressive output" and will "impose[ ] a significant burden on the public's right to read and hear what the employees would otherwise have written and said." Id. at ---- - ----, 115 S.Ct. at 1014-15. As in the present case, without the money, the plaintiffs would not have engaged in the protected expressive activity.
 
 
 28
 Furthermore, the street marketing is in fact a part of the message of appellants' art. As they note in their submissions to the court, they believe that art should be available to the public. Anyone, not just the wealthy, should be able to view it and to buy it. Artists are part of the "real" world; they struggle to make a living and interact with their environments. The sale of art in public places conveys these messages.
 
 
 29
 The district court seems to have equated the visual expression involved in these cases with the crafts of the jeweler, the potter and the silversmith who seek to sell their work. Bery, 906 F.Supp. at 167. While these objects may at times have expressive content, paintings, photographs, prints and sculptures, such as those appellants seek to display and sell in public areas of the City, always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection. Courts must determine what constitutes expression within the ambit of the First Amendment and what does not. This surely will prove difficult at times, but that difficulty does not warrant placing all visual expression in limbo outside the reach of the First Amendment's protective arm. Courts have struggled with such issues in the past; that is not to say that decisions are impossible. See, e.g., Dallas v. Stanglin, 490 U.S. 19, 24-25, 109 S.Ct. 1591, 1594-95, 104 L.Ed.2d 18 (1989) (social dance distinguished from expressive dance); Yurkew v. Sinclair, 495 F.Supp. 1248, 1253 (D.Minn.1980) ("[w]herever the amorphous line of demarcation exists between protected and unprotected conduct for First Amendment purposes, ... tattooing falls on the unprotected side of the line"). Furthermore, simply because the matter does not lend itself to judicial determination does not mean that it is not appropriate for local lawmakers and governmental bodies such as the City to tackle.[6]
 
 II.
 
 30
 Having determined that appellants' artwork is entitled to full First Amendment protection, we turn now to an application of the appropriate constitutional test. In examining the constitutionality of a regulation that impinges on First Amendment activity, courts will apply a strict scrutiny analysis when the regulation discriminates on the basis of content, and a more lenient analysis to content-neutral regulations. Turner Broadcasting System, Inc. v. Federal Communications Comm'n, 512 U.S. 622, ----, 114 S.Ct. 2445, 2469, 129 L.Ed.2d 497 (1994).
 
 
 31
 The district court labelled the ordinance content-neutral, since it raised no concerns over censorship. It is not clear that this ordinance is content-neutral, however; it distinguishes between written and visual expression in a manner that effectively bans one while subjecting the other to a more limited form of regulation. See, e.g., Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 592-93, 103 S.Ct. 1365, 1375-76, 75 L.Ed.2d 295 (1983) (law that "targets individual publications within the press" must surmount a heavy burden to satisfy First Amendment strictures); Buckley v. Valeo, 424 U.S. 1, 18, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976) (only regulations which do not discriminate among speakers or ideas are content-neutral). The ordinance's effective bar on the sale of artwork in public places raises concerns that an entire medium of expression is being lost. See, e.g., City of Ladue v. Gilleo, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). We need not decide that issue, however, since the ordinance must fall even under the less restrictive yardstick the court applied.
 
 
 32
 A content-neutral regulation may restrict the time, place, and manner of protected speech, provided it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication." Ward, 491 U.S. at 791, 109 S.Ct. at 2752, quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). The City certainly has a significant interest in keeping its public spaces safe and free of congestion. The license requirement as it relates to appellants, however, which effectively bars them from displaying or selling their art on the streets, is too sweeping to pass constitutional muster. See, e.g., Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429-30, 113 S.Ct. 1505, 1516-17, 123 L.Ed.2d 99 (1993). The district court's failure to properly analyze the questions of narrow tailoring and alternative channels was an abuse of discretion that led to an incorrect result.
 
 
 33
 The ordinance is a de facto bar preventing visual artists from exhibiting and selling their art in public areas in New York. The total number of licenses outstanding at any given time is a low 853. Those fortunate enough to possess one of these permits may automatically renew it annually which, of course, means that late-comers like appellants have little hope of securing a license in the foreseeable future. In addition to this all-but-impenetrable barrier, a 500 to 5000 person waiting list makes appellants' prospects of securing a license apparently nonexistent, a fact conceded at oral argument.[7]
 
 
 34
 The City may enforce narrowly designed restrictions as to where appellants may exhibit their works in order to keep the sidewalks free of congestion and to ensure free and safe public passage on the streets, but it cannot bar an entire category of expression to accomplish this accepted objective when more narrowly drawn regulations will suffice. The City points to nothing on this record concerning its need to ensure street safety and lack of congestion that would justify the imposition of the instant prohibitive interdiction barring the display and sale of visual art on the City streets. See Wright v. Chief of Transit Police, 558 F.2d 67, 68-69 (2d Cir.1977) (city must find less restrictive alternative than complete ban on newspaper vending in subways); Loper v. New York City Police Dep't, 999 F.2d 699, 704-05 (2d Cir.1993) (street begging constitutes expressive conduct which cannot be totally barred without unconstitutional interference with First Amendment rights.)
 
 
 35
 This is not to say that the display of large, cumbersome works that would block public traverse on the streets may not be subjected to discrete regulation as to time, place and location or indeed that both visual and written expression may not be so restricted by regulations addressed to particular areas of the City where public congestion might create physical hazards and public chaos. For example, requiring a license for a parade, Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941), or for a vending machine, City of Lakewood, 486 U.S. at 760, 108 S.Ct. at 2145, or restricting the right to distribute newspapers through newsracks on public property not traditionally a place for public communication, Gannett Satellite Information Network v. Metropolitan Transportation Authority, 745 F.2d 767, 772 (2d Cir.1984), are all valid exercises of state police power to control time, place and manner of public access to public spaces.
 
 
 36
 The ordinance as it stands, however, cannot be considered merely a regulation designed for crowd management and control, or to prevent congestion or to keep the streets clear to allow unimpeded passage of the public over the City's thoroughfares. There exist specific sections of the Administrative Code which directly regulate time, place, manner and location of vending that already achieve these ends without such a drastic effect. See, e.g., Administrative Code § 20-465. Furthermore, the City's licensing exceptions for veterans and vendors of written material call into question the City's argument that the regulation is narrowly tailored. The City does not maintain control over the absolute number of vendors, since the exceptions are unlimited; the number 853 does not in and of itself control congestion. The City's control over congestion is largely maintained through the time, place and manner restrictions on vending that facilitate the flow of traffic, ease crowding and improve safety.[8]
 
 
 37
 We turn now to a consideration of whether alternative channels of communication exist for appellants' protected expression. Appellants argue that no such alternatives exist. They contend that licenses are virtually impossible to obtain, and no other forum exists for the display of art by appellants, since museum and gallery space in New York City is drastically limited.
 
 
 38
 The City states that alternatives exist; appellants may sell their artwork from their homes or seek permission to display it in restaurants and street fairs and the like. However, appellants are entitled to a public forum for their expressive activities. Southeastern Promotions Ltd., 420 U.S. at 556 , 95 S.Ct. at 1245(1975); Gold Coast Pub., Inc. v. Corrigan, 798 F.Supp. 1558, 1572 (S.D.Fla.1992), aff'd in part, rev'd in part on other grounds, 42 F.3d 1336 (11th Cir.1994), cert. denied, --- U.S. ----, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995). Displaying art on the street has a different expressive purpose than gallery or museum shows; it reaches people who might not choose to go into a gallery or museum or who might feel excluded or alienated from these forums. The public display and sale of artwork is a form of communication between the artist and the public not possible in the enclosed, separated spaces of galleries and museums.
 
 
 39
 Furthermore, to tell appellants that they are free to sell their work in galleries is no remedy for them. They might not be at a point in their careers in which they are interested in reaching the public that attends exhibits at art galleries--if, indeed, they could get their works accepted for showing. Appellants are interested in attracting and communicating with the man or woman on the street who may never have been to a gallery and indeed who might never have thought before of possessing a piece of art until induced to do so on seeing appellants' works. The sidewalks of the City must be available for appellants to reach their public audience. The City has thus failed to meet the requirement of demonstrating alternative channels for appellants' expression.
 
 
 40
 On the basis of this record before us, the City's requirement that appellants be licensed in order to sell their artwork in public spaces constitutes an unconstitutional infringement of their First Amendment rights. The district court abused its discretion in denying the preliminary injunction.
 
 
 41
 Finally, we note that the district court was similarly incorrect in its rejection of appellants' argument under the Equal Protection Clause of the Fourteenth Amendment. The requirement that appellants' art cannot be sold or distributed in public areas without a general vendors license, while written material may be sold and distributed without a license, must fall for the same reasons outlined above. Since the ordinance does impermissibly impinge on a fundamental right, the district court incorrectly dismissed the equal protection argument under a rational basis test.
 
 
 42
 Accordingly, the judgment of the district court is reversed.
 
 
 43
 MAHONEY, Circuit Judge, concurring in the judgment and partly in the opinion of the Court:
 
 
 44
 I concur in the judgment of the Court and in the opinion of the Court except for its discussion of the Equal Protection Clause of the Fourteenth Amendment.
 
 
 
 [1]
 Honorable Robert L. Carter of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [2]
 It is not clear whether this is the delay anticipated to receive a license or merely to be placed on the waiting list
 
 
 [3]
 Serra v. U.S. General Services Admin., 847 F.2d 1045 (2d Cir.1988) does not compel a different holding. In Serra, this court held that "artwork, like other non-verbal forms of expression, may under some circumstances constitute speech for First Amendment purposes." Id. at 1048. The court did not actually reach the question of the level of constitutional protection in artwork, however, since it found that "the First Amendment has only limited application in a case like the present one where the artistic expression belongs to the Government rather than a private individual." Id
 
 
 [4]
 A language written and spoken in the Senegambia region of West Africa
 
 
 [5]
 A language used by both indigenous and non-indigenous peoples in Paraguay
 
 
 [6]
 The City proves itself ready to undertake the similarly difficult task of separating written from non-written materials. (See Aff. in Support of Cross-Motion for Summary J. at 2-3, reprinted in Joint Appendix at 196-97: e.g., baseball cards are written material, calendars and street maps are not.) There already exists in city ordinances a definition of "artist" that might serve as a helpful starting point: the New York Multiple Dwelling Law, Section 276 defines "artist" for the purpose of determining eligibility for living-work quarters earmarked for artists
 
 
 [7]
 Richard Schrader, former Commissioner of the City's Department of Consumer Affairs, the department which creates policy regarding licensing of general vendors, states that in an average year 15% of the 853 licenses become available due to previous holders' failure to renew, the only manner in which a license becomes available. (Joint Appendix at 221). In 1990 and in 1991, no licenses were available. In 1993, the discovery of a bookkeeping error revealed that 553 rather than 853 licenses were outstanding. The Department distributed 100 licenses to individuals on the waiting list and issued 200 more by lottery. This is the only occasion when licenses have been awarded in this manner. Aside from this, "no new licenses were issued in the past fifteen years," and based on Schrader's "extensive experience and knowledge," he has "never learned of an artist being licensed to sell art work." (Joint Appendix at 221-223)
 
 
 [8]
 Even if the City were to adhere to a licensing system to regulate street art sales, there exist less intrusive means of issuing the licenses: one amicus suggests a rotating first-come, first-served lottery system for assigning a limited number of licenses. (Brf. amici curiae of the American Civil Liberties Union et al. at 26-27). The system employed by San Francisco might provide a model: certain areas are set aside for art sales and a weekly lottery assigns spots. (Joint Appendix at 313-14, 351). The district court made no mention of these potential alternatives