Robert TURLEY and Tyrone Hamlette, Plaintiffs,

v.

Rudolph GIULIANI, in his official capacity as Mayor of the City of New York and in his individual capacity; Howard Safir, in his official capacity as Police Commissioner of the City of New York and in his individual capacity; Joel Miele, in his official capacity as Commissioner of the Department of Environmental Protection of the City of New York; Thomas Purtell and Diane O'Connor, in their official and individual capacities; and the City of New York, Defendants.

No. 99 Civ. 3381(SAS).

United States District Court, S.D. New York.

Feb. 15, 2000.

Robert T. Perry, Brooklyn, New York, for Plaintiff.

Dana H. Biberman, Corporation Counsel for the City of New York, New York, NY, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs, Robert Turley and Tyrone Hamlette, are professional street musicians who perform in and around the Times Square area. They bring this action to vindicate their First Amendment right to play reasonably amplified music on the sidewalks and traffic islands which comprise Times Square. Plaintiffs have moved for a preliminary injunction enjoining and restraining the defendants (collectively, the "City") from: (1) enforcing a decibel ceiling of 85–dB(A)–at–10 feet; (2) specifying a decibel ceiling lower than 95–dB(A)–at–15 feet on their sound device permits; (3) charging plaintiffs with making "unreasonable noise" or exceeding the allowable decibel level based on arbitrary sound measurement practices; (4) impos-

ing restrictions on plaintiffs' amplified music from which corporate-sponsored amplified events are exempt; (5) favoring certain Fifth Avenue business entities in the processing and issuance of sound device permits for the area in front of Trump Plaza at 5th Avenue and 58th Street; and (6) granting such entities "sham" permits in order to limit plaintiffs' opportunities for sound device permits at that location. The first three demands are referred to as the "sound level demands" while the latter three demands are referred to as the "preferential treatment complaints." For the reasons that follow, plaintiffs' motion is granted in part and denied in part.

## I. Facts

### A. The Music

Plaintiffs are street musicians who earn their living by performing music on sidewalks and traffic islands in and near Times Square. Affidavit of Robert Turley in Support of Plaintiffs' Motion for a Preliminary Injunction, sworn to November 2, 1999 ("Turley Aff."), ¶ 2. Turley plays the electric bass and the TrebleBass, which is a combined electric bass and guitar, while Hamlette plays a portable drum kit. Id. Neither of Turley's instruments can be heard without a sound amplifier. Id. In order to earn a living, plaintiffs typically perform an eclectic mix of soul and jazz six to eight hours a day, five days a week. Id., ¶ 3. They usually play at a volume of 95 dB(A)–at–15 feet, which they contend is just loud enough to be heard above the ambient noise. Id. In good weather, plaintiffs attract between 15 and 20 people who typically stand 15 to 20 feet away from them. Id.

### B. The City's Sound Device Permit Scheme

To obtain a sound device (amplification) permit, an applicant must apply at least five days prior to the proposed use to the police precinct covering the area in which the sound device is to be used. See N.Y.C. Admin. Code § 10–108(e). The applicant must state the exact time, date and location where he or she proposes to use a sound device. Id. Each sound device permit must specify the exact time, date and location where the sound device may be used. N.Y.C. Admin. Code § 10–108(f). Each sound device permit must specify the "maximum volume of sound which may be employed in [the] use or operation" of the sound device. Id.

Turley typically applies for at least one five-day permit at either Mid Town North Police Precinct ("MTN"), which serves Times Square and the vicinity above West 45th Street, or Mid Town South Police Precinct ("MTS"), which serves Times Square and the vicinity below West 45th Street. Id., ¶ 5.

Prior to March 1998, both MTN and MTS specified a 75–dB(A)–at–6 feet decibel level. Declaration of Robert T. Perry, plaintiffs' attorney, in Support of Plaintiffs' Motion for a Preliminary Injunction, sworn to November 3, 1999 ("Perry Decl."), ¶ 6. In March of 1998, in response to earlier litigation brought by Turley contesting the 75–dB(A)–at–6 feet decibel level, MTN began specifying an 85–dB(A)–at–6 feet decibel ceiling on sound device permits. Turley Aff., ¶ 8. At about the same time, MTS began specifying an 85–dB(A)–at–10 feet decibel ceiling. Id. On July 31, 1999, MTN raised the decibel ceiling to 85–dB(A)–at–10 feet. Id., ¶ 16. The Department of Environmental Protection ("DEP"), however, has adopted the permissive policy of not pursuing enforcement[1] unless the

---

1. Both the New York City Police Department ("NYPD") and the DEP have the authority to enforce the provisions of Admin. Code § 10–108. Declaration of Dana H. Biberman, defendants' attorney, in Opposition to Plaintiffs' Motion for a Preliminary Injunction, sworn to December 16, 1999 ("Biberman Decl."), ¶ 7. Whenever the DEP receives a noise complaint, whether from the NYPD or directly from the public, it dispatches an inspector with a sound meter to determine whether further enforcement action is required. See

measured sound level exceeds the permissible sound level limit by more than 3 decibels. Thus, a violation will not issue unless the sound level is at least 88–dB(A)–at–10 feet. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Opp. Memo") at 9.

### C. The City's Noise Code

The New York City Noise Code, Title 24, Chapter 2, §§ 24–201 *et seq.* of the Administrative Code, was enacted in 1972 to "reduce the ambient noise level in the city, so as to preserve, protect and promote the public health, safety and welfare, and the peace and quiet of the inhabitants of the city ..." N.Y.C. Admin. Code § 24–202. The Noise Code is primarily enforced by the DEP. Perry Decl., ¶ 8 (citing N.Y.C. Admin. Code § 24–204). Section 24–218 of the Noise Code prohibits the making of "unreasonable noise," a term defined to mean:

> any excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities or injures or endangers the health or safety of a reasonable person of normal sensitivities, or which causes injury to plant or animal life, or damage to property or business.

N.Y.C. Admin. Code § 24–203(ccc).

Furthermore, § 24–220(a) provides that "[e]xcept as provided in section 10–108 of the [Administrative] code, no person shall operate or use or cause to be operated or used any sound reproduction device in such a manner as to create any unreasonable noise." Plaintiffs note that the City of New York has previously taken the position that a street musician will not be charged with making "unreasonable noise" unless the sound device is being operated at a level in excess of the allowable decibel ceiling and at least 10dB(A) above the ambient noise level. Perry Decl., ¶ 10 (cit-

ing *Turley v. New York City Police Dep't,* 988 F.Supp. 675, 679–80 (S.D.N.Y.1997) (*"Turley I"*), *aff'd. in part, rev'd in part,* 167 F.3d 757 (2d Cir.1999)).

## II. Discussion

### A. Standard for Preliminary Injunctive Relief

■ A preliminary injunction generally may not be issued unless the plaintiff demonstrates that it is necessary to prevent irreparable harm and either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant. *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994); *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994). However, when the "moving party seeks a preliminary injunction to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," a preliminary injunction should only be granted if the movant meets the more rigorous "likelihood of success" standard. *Latino Officers Ass'n v. City of New York,* 196 F.3d 458, 462 (2d Cir.1999) (internal quotation marks and citations omitted).

Plaintiffs argue that because there are public interest concerns on both sides of this case, they may rely on the less rigorous "fair ground for litigation" standard. Plaintiffs cite *Time Warner Cable of New York City v. Bloomberg L.P.,* 118 F.3d 917, 923 (2d Cir.1997) in support of this proposition. However, in *Time Warner* plaintiff did not seek to enjoin the exercise of governmental regulatory authority. *Id.* at 923–24. Rather, plaintiff, a cable operator, sought to enjoin New York City from using channels reserved for public, educational or governmental ("PEG") purposes for two 24–hour news programs produced by commercial television pro-

Affidavit of Robert Rasmussen, Inspector with the New York City DEP, sworn to December 13, 1999 ("Rasmussen Aff."), ¶ 3.

grammers. *Id.* at 919. In weighing the public interest concerns on both sides, the court noted that "the proposed action of the City in deciding what programming to place on one of its reserved PEG channels is more akin to ... proprietary action." *Id.* at 923. In issuing the injunction, the court held that the public interest in maintaining PEG channels for their intended use outweighed the needs of the viewing public for a diversified range of traditional commercial programming, a need adequately met by numerous non-PEG channels. *Id.* at 929. There is no proprietary action at issue here—plaintiffs are seeking to prevent the City from exercising its regulatory authority by enforcing the current decibel ceiling. *See id.* at 923–24 (higher standard applies where plaintiff seeks "to prevent the exercise of governmental regulatory authority"). Accordingly, the likelihood of success standard will apply here as it did when Turley previously sought preliminary injunctive relief. *See Turley v. New York City Police Dep't,* 93 Civ. 8748, 1996 WL 93726, at *3 (S.D.N.Y. Mar. 5, 1996).

It is well established that "'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm.'" *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Because the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits. *See Bery v. City of New York,* 906 F.Supp. 163, 166 (S.D.N.Y.1995), *rev'd on other grounds,* 97 F.3d 689 (2d Cir.1996).

### B. Sound Level Demands

#### i. The 85–dB(A)–at–10 Decibel Level

In traditional public fora, plaintiffs have a First Amendment right to engage in expressive activity and communicate effec-

tively. *New York Magazine, a Div. of Primedia Magazines, Inc. v. Metropolitan Trans. Auth.,* 136 F.3d 123, 128 (2d Cir.), *cert. denied,* 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998) (citations omitted). And music is a form of expression and communication that is protected under the First Amendment. *Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Moreover, sound amplification is often necessary to effective communication. *Saia v. People of State of New York,* 334 U.S. 558, 561, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

The City may regulate the time, place and manner of amplified music to prevent excessive noise, limit congestion and ensure public safety. *Ward,* 491 U.S. at 791–92, 109 S.Ct. 2746; *Bery v. City of New York,* 97 F.3d 689, 697 (2d Cir.1996). That power, however, is sharply circumscribed and "subject to the highest scrutiny." *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). Government regulations limiting the time, place or manner of expression will be upheld "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (citations omitted).

Plaintiffs' first "sound level demand" is that the City should be enjoined from enforcing its decibel ceiling of 85–dB(A)–at–10 feet because that ceiling lacks narrow tailoring and burdens "substantially more speech than necessary to further the [City's] legitimate interests." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746. This is due, in part, to defendants' practice of excluding regular "noise events," such as car horns, accelerating/braking buses, and construction sounds, which equal or exceed

85–dB(A)–at–10 feet virtually every minute of the day, from their measurement of ambient noise. Turley Aff., ¶ 19. Plaintiffs rely on their expert, Alan Fierstein, who measured ambient noise at three different locations around Times Square and found twelve noise events per minute averaging 86dB(A); three noise events per minute averaging 83dB(A); and one noise event per minute averaging 78 dB(A). Affidavit of Alan Fierstein in Support of Plaintiffs' Motion for a Preliminary Injunction, sworn to June 4, 1999 ("Fierstein Aff."), ¶¶ 12–14. By eliminating these noise events, the defendants are arguably underestimating the ambient noise level and, consequently, the decibel level needed to be effectively heard over that ambient noise level.

Defendants refute these ambient sound measurements by contending that Fierstein measured extraneous peaks and, without regard for the duration or the intervening sound levels, reported the arithmetic average of these peaks as the ambient sound levels. Zwerling Aff., ¶ 18. Defendants contend that the ambient sound levels in the Times Square area are predominantly below 75 dB(A). Id. at ¶ 6. This conclusion is based on readings taken between the hours of noon and 10:00 p.m. on two separate days. Id.

Plaintiffs also argue that their audience, which typically stands 15—20 feet away from them, will have trouble hearing their music much beyond 10 feet at a 85–dB(A)–at–10 feet level. Plaintiffs' Memorandum of Law in Support of Motion for a Preliminary Injunction ("Pl. Memo") at 19. Plain-tiffs argue that this ceiling lacks narrow tailoring because it fails to take into account the jury's implicit finding in a previous trial in 1997 (*Turley I* ) that plaintiffs need a 15–to–20 signal-to-noise ratio [2] to be heard and appreciated in Times Square.[3] *See Turley I,* 988 F.Supp. at 679.

Defendants counter that the 85–dB(A)–at–10 feet decibel limit is sufficiently narrowly tailored as it allows plaintiffs to be clearly audible to their audience. According to defendants, an increase of 10 decibels results in a doubling of perceived loudness. Opp. Memo at 16 (citing Zwerling Aff., ¶¶ 5, 7). In other words, at 10 decibels above the ambient noise level, music at 85 decibels will be perceived as two times louder than the ambient sound level of 75 dB(A). Id. "Moreover, since doubling the distance from a point source reduces levels by 6 dB(A), setting a permissible limit of 85 dB(A) when measured at 10 feet will result in the music having a sound level of 79 dB(A) at 20 feet. Music which is 4 dB(A) above the ambient sound level will be plainly audible above background . . ." Id. at 17.

On February 2, 2000, I was accompanied by the parties, their attorneys, and their experts to witness a demonstration of plaintiffs' music as it is heard on the street.[4] The demonstration occurred in front of the Marriott Hotel at 46th Street and Broadway at approximately 6:30 p.m. I listened to the music at the 85–dB(A)–at–10 feet and 88–dB(A)–at–10 feet decibel levels from distances ranging from 10 to 20 feet. At 10 and 15 feet, I subjectively

**2.** This is the difference in decibels between the source sound level and the ambient sound level. Thus, at a 75dB(A) ambient sound level, a 90–95 dB(A) ceiling would be needed assuming a signal-to-noise ratio of 15–to–20.

**3.** Whether the jury "implicitly" agreed with Fierstein's 15–to–20 signal-to-noise ratio is not a foregone conclusion. This Court held in *Turley I* that "by crediting this expert testimony, the jury could reasonably conclude that plaintiff's music would not be heard in the Times Square area when the difference between the 'signal'—his music played at 75 decibels at six feet—and the 'noise'—an ambient sound level of 71 decibels—is only 4 decibels." 988 F.Supp. at 679. It appears that the jury did not explicitly consider the signal-to-noise ratio in reaching this conclusion.

**4.** This "field trip," which was videotaped by Turley, constitutes the preliminary injunction hearing. The videotape of that hearing, along with the briefs, affidavits, exhibits, and post-visit letter submissions, constitutes the preliminary injunction record.

found plaintiffs' music to be moderate on a scale of very loud, loud, moderate, low, too low and inaudible. At 20 feet, I found the music to be moderate to low but still clearly audible.[5] I also noted that the ambient sound level ranged from 75 to 80.dB(A), without excluding any extraneous sounds. Given these observations, plaintiffs have not shown a likelihood of success on the merits of their claim that the 85–dB(A)–at–10 feet level is unduly restrictive. *See Ward*, 491 U.S. at 802, 109 S.Ct. 2746 ("That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate."); *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (limits on where members of religious sect were allowed to set up a booth, distribute/sell literature, and solicit funds on fairgrounds did not violate their First Amendment rights because the regulations provided them with "an adequate means to sell and solicit on the fairgrounds"). Accordingly, injunctive relief prohibiting the City from enforcing the 85dB(A)–at–10 feet decibel ceiling is denied.

### ii. The 95–dB(A)–at–15 Decibel Level

█ Plaintiffs' second "sound level demand" is that the defendants should be enjoined from setting a decibel ceiling any lower than 95–dB(A)–at–15 feet. Defendants contend that a sound level of 95–dB(A)–at–15 feet is intrusive to many people and may force pedestrians to detour to avoid being exposed to this level of sound. Opp. Memo at 6. Again, based on my own observations, I found the 95–dB(A)–at–15 feet level to be·loud when

heard from 15 and 20 feet away. Moreover, I am concerned that those walking along the sidewalk, at much closer proximity to plaintiffs, may find this decibel level objectionable and annoying. The City's Noise Code and permit scheme are meant to benefit the entire population, including those wishing to hear street music and those wishing to get to their destinations without detour. As such, the rights of those who wish to be protected from intrusive noise are no less important than the rights of those who enjoy loud street music. Plaintiffs have not shown a likelihood of success on the merits of their claim that a 95–dB(A)–at–15 feet decibel level should be permitted. Thus, defendants are not preliminarily enjoined from enforcing a decibel ceiling below that level. This conclusion is buttressed by my earlier finding that an 85–dB(A)–at–10 feet level is sufficiently loud.

### iii. Methods of Sound Measurement

Plaintiffs' third "sound level demand" involves the method by which the sound level of their music and the ambient sound level for the Times Square area are measured. Typically, when the NYPD receives a noise complaint it sends a DEP inspector to the site to determine whether a Notice of Violation ("NOV") should issue by measuring the respective sound levels. The DEP inspector measures the sound produced by the music for a very short period—approximately 10 seconds—and focuses on the peak reading on the sound meter during that time frame. Turley Aff., ¶ 15. The DEP inspector also measures the ambient noise level at that location—for approximately 30 seconds—to find a "steady state" ambient noise level. *Id.* In measuring the ambient noise level,

---

5. In this regard, it should be noted that plaintiffs' music as heard on the street is not meant to replicate the conditions of a concert hall. It should merely be loud enough to be capable of being appreciated by those who wish to do so. It should also be noted that plaintiffs' audience typically stands approximately 15 feet away to allow for pedestrian traffic on the sidewalk. Those who wish to hear the music at a higher volume could conceivably stand adjacent to the areas in which plaintiffs play. Furthermore, defendants have a legitimate interest in protecting the rights of pedestrians, who walk very near the plaintiffs, to be free of unreasonably loud music. ·

the DEP inspector excludes all "extraneous" sounds such as car horns, ambulances, and accelerating/braking buses. A NOV will be issued if the sound from the music is above the permitted decibel level.

Plaintiffs object to the use of peak sound levels when measuring their music as being unsupported by empirical data. Reply Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction ("Reply Memo") at 6. Plaintiffs also object to the use of "snapshot measurements" (10 seconds for sound source, 30 seconds for ambient noise level) as arbitrary and "too small a sample from which to reliably draw any valid conclusions ..." *Id.* at 5. Finally, plaintiffs argue that the exclusion of extraneous sounds from the ambient noise level is completely arbitrary because the DEP inspectors have unfettered discretion to decide which sounds are excludable. *Id.* at 7.

Defendants support the method by which they take sound level measurements. First, defendants contend that the "DEP's practice of comparing peak sound levels of the sound source to background sound levels for enforcement purposes is consistent with acceptable industry standards as it is designed to ascertain the normal and usual operation of the sound source." Opp. Memo at 8. In support of this statement, defendants cite the Affidavit of Eric M. Zwerling, defendants' sound expert, sworn to December 15, 1999 ("Zwerling Aff."), ¶¶ 29–30 ("Virtually every jurisdiction I have worked with enforces on peak measurements so long as they represent the normal, usual operation of the sound source under investigation ... Complaints are usually based upon the peak sound levels that may be particularly intrusive; they are not based on the average sound level of the source. It is then entirely appropriate to measure these peaks, so long as they represent the normal usual operation of the sound source."). According to defendants, plaintiffs' music is performed at a consistent level, varying by no more than 4—8 decibels. Second,

defendants argue that "for purposes of enforcement, the only relevant ambient sound levels are those immediately preceding or following the measurements of the sound source under investigation. These ambient sound level measurements need not take more than a few minutes." Opp. Memo at 8 (citing Zwerling Aff., ¶ 25). With regard to extraneous sounds, defendants point to paragraph 17 of the Zwerling Affidavit: "I know of no jurisdiction that includes short duration intense sound events in the determination of ambient sound levels for the purposes of establishing a baseline for enforcement purposes. The standard practice is to exclude extraneous noises ..."

■ The City's method with regard to the timing of sound measurements, i.e., ten seconds for source sound, thirty seconds for ambient noise level, is not so arbitrary as to be inherently inconsistent with valid time, place and manner regulations. *See Ward*, 491 U.S. at 800, 109 S.Ct. 2746 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest ..., the regulation will not be invalid simply because a court concludes that the government's interest could adequately be served by some less-speech-restrictive alternative."); *see also Johnson v. Bax*, 63 F.3d 154, 158 (2d Cir.1995) (government's limited discretion in regulating the use of its streets must be exercised uniformly and systematically so as not to create any unfair discrimination).

■ I do find, however, that the City's practice of conferring unfettered discretion on the DEP inspectors in deciding which noises to exclude as extraneous is unduly arbitrary. In the absence of a published standard listing which noises to include and which to exclude, the unguided exclusion of various noises by different DEP inspectors is arbitrary and capricious. The abuse of this discretion by DEP inspectors could easily lead to content-based discrimination. *See Heffron*, 452 U.S. at 649, 101 S.Ct. 2559 (government regulation that allows arbitrary application is "inher-

ently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view"). Therefore, until the City develops published criteria of which extraneous sounds to include and exclude, it will be preliminarily enjoined from excluding any extraneous noises in the measurement of ambient sound levels.[6]

### C. Preferential Treatment Complaints

#### i. Corporate–Sponsored Event Exemption

■ Plaintiffs' first preferential treatment complaint is that while they are subject to the 85–dB(A)–at–10 feet decibel ceiling, corporate-sponsored music events, such as Time Warner's musical extravaganza, JVC concerts and the Broadway on Broadway concert, have been exempt and consequently far exceed the decibel level imposed on plaintiffs. Turley Aff., ¶ 17. Plaintiffs claim that this discrepancy violates the Equal Protection Clause of the Fourteenth Amendment and is therefore impermissible.

In response, defendants state that the permissible decibel ceiling on a sound permit is based on the information supplied by the applicant. Opp. Memo at 19 (citing Affidavit of Stephen Giaco, an officer of the NYPD, sworn to December 17, 1999 ("Giaco Aff."), ¶ 5). In that affidavit, Officer Giaco states:

6. By not excluding any extraneous noises, an average decibel level must be computed to arrive at the ambient sound level. The City may also wish to consider using longer time spans when measuring ambient sound, perhaps two minute intervals rather than thirty seconds.

7. Plaintiffs also intimate that this conduct constitutes impermissible content-based discrimination in violation of the First Amendment. This argument is meritless. The fact that corporate-sponsored events permit performers to play at higher volumes than those plaintiffs are permitted to use does not, in itself, indicate that the regulations discrimi-

If the event sponsor anticipates a much larger audience, such as several hundred or several thousand, then the permissible decibel level will be adjusted accordingly to allow the speaker or performer to be heard by his or her audience. Moreover, if the activity is to take place where streets have been closed to traffic, the decibel ceiling can be set at a higher level since some of the concerns for pedestrian and vehicular safety will not be at issue.

Giaco Aff., ¶ 5. This appears to be a credible and reasonable explanation for the differences in decibel limits set for corporate-sponsored events, which tend to be more elaborate affairs drawing audiences considerably larger than 10 to 15 people.[7]

Furthermore, in equal protection analysis, suspect classes have generally been limited to groups defined by their status such as race, origin and gender, and not by the conduct in which they engage. *Able v. United States*, 155 F.3d 628, 632 (2d Cir. 1998). Street musicians do not fall within any suspect class. Accordingly, the rational relationship test applies to the government action challenged here. Where the "government differentiates between persons for a reason that bears a rational relationship to an appropriate governmental interest," there is no violation of equal protection. *Id.* at 631. Because the government has the legitimate interest in enabling corporate-sponsored events to be heard by large audiences, the discrepancy between the current decibel level imposed

nate based on the content of the speech. The City has explained that the difference in permitted sound levels is due to the size of the audiences and the number of performers and plaintiffs have offered no evidence to the contrary. The City's use of articulable standards removes "the specter of content and viewpoint censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker").

on plaintiffs and the higher levels granted to corporate sponsors does not present a constitutional violation. Plaintiffs therefore will not be relieved of the current restrictions imposed on them despite the disparity in decibel ceilings between their music and certain corporate-sponsored events.

### ii. Preferential Treatment for Certain Fifth Avenue Entities

Plaintiffs' second preferential treatment complaint is that MTN has afforded preferential treatment to certain Fifth Avenue business entities—the Fifth Avenue Business Improvement District, the Fifth Avenue Association, and the Trump Organization (collectively, the "5th Avenue entities")—in the processing and issuance of sound device permits for the sidewalk in front of Trump Plaza at 5th Avenue and 58th Street. Turley Aff., ¶ 24. Specifically, plaintiffs allege that MTN accepts and processes sound device permits for the 5th Avenue entities before allowing Turley to submit applications, allows them to fax applications while requiring Turley to apply in person, and lets them separately apply for sound device permits for successive weeks for the very same use. *Id.*, ¶¶ 25, 27–28.

Defendants respond that applications are generally handled on a first-come, first-served basis. Opp. Memo at 24 (citing Giaco Aff., ¶ 4). For particular locations, such as 58th Street and 5th Avenue, MTN has implemented a "rotation system." According to Officer Giaco, under this system,

a permit application is date and time stamped when it is received at the precinct. If a permit for the requested date and location has already been issued, this applicant will have the oppor-

tunity to get a sound amplification permit for that location during the next available five-day period. No individual or group who has already received a permit for that location will receive another permit for the same location until all the other applicants for sound permits for that location have had an opportunity to receive a sound amplification device permit. The applicant can, in the meantime, however, receive a sound device permit at an acceptable alternate location.

Giaco Aff., ¶ 8. As plaintiffs have not yet presented any evidence that their permit applications are intentionally processed later than those of the 5th Avenue entities, a preliminary injunction restraining this alleged practice is not warranted at this time.[8]

Defendants also point out that Turley has received a sound device permit from MTN for every week requested during the past six months, although not always at his first choice location. *Id.*, ¶ 10. Moreover, plaintiffs have received permits for the 5th Avenue and 58th Street location more than any other applicant for that location. *Id.*, ¶ 11. Nonetheless, this does not refute plaintiffs' remaining specific complaints, namely, processing by fax and successive week use.

The successive week use complaint is addressed in Exhibit N of defendants' motion papers. Exhibit N is a summary of sound permits issued at 58th Street and 5th Avenue for the period starting on June 2, 1999 and ending on November 30, 1999. A review of Exhibit N reveals that Turley received sound permits seven times during this period while Ms. Padilla, representing the 5th Avenue entities, received five permits. None of the permits issued to either

---

8. The "evidence" submitted by plaintiffs consists of Turley's allegation that a clerk at MTN told him that in December of 1998 an application on behalf of the 5th Avenue entities had been made by Police Officer Diane O'Connor and had been accepted on the spot. Turley Aff., ¶ 25. This unsubstantiated allegation is insufficient to prove the complained of practice. Sufficient evidence would include, for example, the deposition testimony of the clerk and Police Officer O'Connor and the time and date stamped applications submitted by plaintiffs and the 5th Avenue entities for the same days.

Turley or Padilla were for successive weeks. This presumably accurate summary refutes plaintiffs' complaint of successive week use. Injunctive relief cannot be ordered in the absence of a violation.

The faxing of permit applications was also addressed by Officer Giaco. *See* Supplemental Affidavit of Stephen Giaco, sworn to February 2, 2000 ("Giaco Supp. Aff."). Officer Giaco states that it is the "policy and practice of MTN to require all sound device permit applicants to submit their applications in person at the precinct between the hours of 9:00 a.m. and 5:00 p.m. on weekdays." Giaco Supp. Aff., ¶ 3. To the best of his recollection, the MTN has not accepted a facsimile transmission during the past year. *Id.,* ¶ 4. Officer Giaco does recall, however, that MTN did in fact accept a few applications by facsimile in limited circumstances, such as the need for the applicant to be out of town at the time of filing. *Id.,* ¶ 5. Officer Giaco states that Turley never made such a request. *Id.* In the meantime, MTN now refuses to accept any application by fax. Thus, MTN has effectively agreed to give up the practice complained of. A preliminary injunction is not required in the absence of irreparable harm.

### iii. Sham Permits

Plaintiffs' final preferential treatment complaint is that the sound device permits issued to the 5th Avenue entities are mere shams because the activities they engage in—handing out pamphlets and providing information—do not require the use of a sound device. Turley Aff., ¶ 29. *See also* Biberman Decl., Ex. N (applications of 5th Avenue entities list "Tourist information & background music"). In response, defendants note that they can only review the information on the application, not the actual use by the applicant. Thus, in order to prove that the permits issued to the 5th

9. Turley alleges that he has notified MTN that the 5th Avenue entities do not use sound devices. This allegation, however, is insufficient to prove that MTN knew of the practice as he does not allege to whom he spoke, on

Avenue entities were shams used to thwart plaintiffs' efforts to secure permits, plaintiffs must demonstrate that the MTN and/or MTS knew that the permits issued to the 5th Avenue entities were not being used for sound amplification.[9] At this early stage, plaintiffs have failed to make the required showing. Accordingly, injunctive relief is not warranted. However, if plaintiffs can make the required showing following a period of discovery, they can renew this application.

### III. Conclusion

For the reasons stated above, plaintiffs' motion for preliminary injunction is denied in all respects except for the challenge to the City's practice of excluding extraneous noises.

what date(s), and the content of his conversations. *See* Reply Affidavit of Robert Turley in Support of Plaintiffs' Motion for a Preliminary Injunction, sworn to December 31, 1999, ¶ 31.