952 F.Supp. 1072 (1997)
GENERAL MEDIA COMMUNICATIONS, INC., International Periodical Distributors Association, National Association of Recording Merchandisers, Periodical and Book Association of America, Inc., Recording Industry Association of America, Inc., and Video Software Dealer Association, Plaintiffs,
v.
William J. PERRY, in his official capacity as the Secretary of Defense, and the Department of Defense, Defendants.
No. 96 Civ. 7525 (SAS).
United States District Court, S.D. New York.
February 20, 1997.
*1073 Michael Bamberger, Helen Kim, Sonnenschein Nath & Rosenthal, New York City, for Plaintiffs.
Daniel Alter, Assistant U.S. Attorney, U.S. Attorney's Office, New York City, for U.S.
Jodie L. Kelley, Jenner & Block, Washington, DC, Amici Curiae.

AMENDED OPINION AND ORDER
SCHEINDLIN, District Judge:
Plaintiffs bring this action to obtain an Order from this Court declaring the Military Honor and Decency Act of 1996, 10 U.S.C. § 2489a (the "Act"), unconstitutional and enjoining defendants from enforcing its terms. For the reasons set forth below, I find the Act violates the First and Fifth Amendments. Accordingly, plaintiffs' request for injunctive relief is granted.

I. INTRODUCTION
Contrary to the arguments of the parties, this case is not about sex or core values. It is a case about pornography, and whether the Constitution protects plaintiffs' right to distribute it in military exchanges.[1] Whether one likes or approves of pornography, however, is not the issue. In a diverse and *1074 democratic society, we tolerate a vast range of discourse, much of it in bad taste and offensive. Our historical decision to elevate the right of free speech above often valid and competing interests has, at times, come at a high price to our communal values and culture. Permitting hatemongers to march in Skokie or to burn crosses in St. Paul surely is not behavior of which the vast majority of Americans approves. Similarly, public flag burning, pornographic movies, or nude dancing are activities that do not reflect the dominant cultural values in American society. Yet these activities are among those that have enjoyed some measure of constitutional protection.[2]
The dilemma we face when the right to free speech conflicts with the equally compelling wish to silence those who demean others with sexist, racist, and otherwise outrageous speech is often a stark one. When balancing these two interests, however, the former must prevail. While the majority of Americans may wish to ban pornography, in the final analysis, society is better served by protecting our cherished right to free speech, even at the cost of tolerating speech that is outrageous, offensive, and demeaning. There is no question that the result of permitting such speech is often unfortunate and unpleasant. But our Constitution has effectively protected us for over two centuries from living in a society where the government intrudes on our individual rights by deciding what consenting adults can read or view. As Judge Learned Hand once eloquently expressed, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943). In the context of our long and rich First Amendment tradition, it becomes clear that sexually explicit material cannot be banned from sale or rental at military exchanges merely because it is offensive.

II. FACTUAL AND PROCEDURAL BACKGROUND
Title 10 of the United States Code, Section 2489a, originally titled the "Military Honor and Decency Act of 1996," was added to the National Defense Authorization Act For Fiscal Year 1997 (Pub.L. 104-201) without debate on May 1, 1996. Signed by President Clinton on September 23, 1996, the Act became effective on December 22, 1996, and provides in pertinent part:
Sec. 2489a. ... (a) PROHIBITION OF SALE OR RENTAL.  The Secretary of Defense may not permit the sale or rental of sexually explicit material on property under the jurisdiction of the Department of Defense.
(b) PROHIBITION OF OFFICIALLY PROVIDED SEXUALLY EXPLICIT MATERIAL.  A member of the armed forces or a civilian officer or employee of the Department of Defense acting in an official capacity may not provide for sale, remuneration, or rental sexually explicit material to another person.
(c) REGULATIONS.  The Secretary of Defense shall prescribe regulations to implement this section.
(d) DEFINITIONS.  In this section: (1) The term `sexually explicit material' means an audio recording, a film or video recording, or a periodical with visual depictions, produced in any medium, the dominant theme of which depicts or describes nudity, including sexual or excretory activities or organs, in a lascivious way.
10 U.S.C. § 2489a. Pursuant to Section 2489a(c), defendants issued implementing regulations that also became effective on December 22, 1996. See Declaration of Daniel S. Alter, Assistant U.S. Attorney, dated December 9, 1996 ("Alter Dec."), Ex. A. at 2. *1075 These regulations define "lascivious" to mean "[l]ewd and intended or designed to elicit a sexual response." Id.
The Act only bans the sale or rental of "sexually explicit" material on military property. It does not restrict the possession of such material on military property. Additionally, military personnel are free to buy "sexually explicit" material off military property or to order it through the mail. Military personnel may also share the same material with their colleagues so long as they do not sell or rent it.[3]
Plaintiff General Media Communications publishes various periodicals including Penthouse. The other plaintiffs are various trade associations whose members are engaged in the wholesale and retail distribution, sale and manufacture of periodicals, books, sound recordings and home videos throughout the nation. Plaintiffs allege that the Act infringes their rights to free speech and equal protection of the laws, in violation of the First and Fifth Amendments, respectively. In addition, they allege that the Act is unconstitutionally vague in violation of the Fifth Amendment.
Penthouse is the third most popular magazine sold by Army and Air Force Exchanges, with sales of approximately 19,000 copies per month.[4]See Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Plaintiffs' Memo") at 4. The January 1997 issue of Penthouse is 222 pages. The magazine contains a number of articles by prominent authors such as Ben Stein and Alan Dershowitz. More than 97 pages include pictures of women, many of whom are totally nude. A substantial number of these pictures reveal female genitalia and women engaged in sexual contact with other women. There can be no dispute that these depictions of women are designed to elicit a sexual response. It also is fair to say that many of these pictures offend commonly shared ideals of decency because of their explicit nature.[5]
On October 18, 1996, plaintiffs filed an Amended Complaint seeking injunctive and declaratory relief from the Act pursuant to 28 U.S.C. §§ 1331 and 2201. On December 20, 1996, this Court issued a Temporary Restraining Order enjoining defendants from enforcing the Act until decision of plaintiffs' motion. Oral argument was heard on December 31, 1996. On January 13, 1997, the parties agreed to treat plaintiffs' motion for a preliminary injunction as one for a permanent injunction.

III. DISCUSSION

A. Legal Standard for Granting Permanent Injunctive Relief

To succeed in an action for permanent injunctive relief, plaintiffs must establish (1) success on the merits of their claims; (2) irreparable harm absent injunctive relief; (3) that the threatened injury to plaintiffs outweighs any harm the injunction may cause to defendants; and (4) that the injunction is not adverse to the public interest. See E.E.O.C. v. Local 40, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, 76 F.3d 76, 80 (2d Cir.1996) (citing Roberts v. Madigan, 702 F.Supp. 1505, 1514 (D.Colo.1989), aff'd, 921 F.2d 1047 (10th Cir.1990), cert. denied, *1076 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992)).
Provided that plaintiffs succeed on the merits of their claims, plaintiffs easily meet the remaining three elements of this test. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). See also Bery v. City of New York, 97 F.3d 689, 693-94 (2d Cir. 1996). Generally, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary." 11A Charles A. Wright, Arthur R. Miller and Mary Kane, Federal Practice and Procedure § 2948.1 at 161 (2d ed. 1995). The defendants cannot claim they will be harmed by an injunction if the Act is unconstitutional, or that the enforcement of an unconstitutional statute best serves the public interest. Thus, if plaintiffs succeed on the merits of their claims, they are entitled to permanent injunctive relief.

B. The First Amendment

It is well established that the government may restrict obscene speech and expressive conduct. See R.A.V. v. City of St. Paul, 505 U.S. 377, 383, 112 S.Ct. 2538, 2543, 120 L.Ed.2d 305 (1992); Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614-15, 37 L.Ed.2d 419 (1973).[6] The government concedes, however, that the terms of the Act extend beyond obscene material. See Transcript of Oral Argument ("Tr.") at 33. This case, therefore, presents the question of whether Congress may restrict the sale or rental of nonobscene speech in a military exchange on the ground that it is "lascivious", which is defined by the implementing regulations to mean "lewd and intended or designed to elicit a sexual response."

1. Visual Images are "Speech" for First Amendment Purposes
Visual images are among the myriad forms of expressive conduct shielded by the First Amendment. See Bery, 97 F.3d at 695 ("As the Supreme Court has reminded us, visual images are `a primitive but effective way of communicating ideas ... a short cut from mind to mind.' West Virginia State Board of Education v. Barnette, 319 U.S. 624, 632 [63 S.Ct. 1178, 1182, 87 L.Ed. 1628] (1943).... One cannot look at Winslow Homer's paintings on the Civil War without seeing, in his depictions of the boredom and hardship of the individual soldier, expressions of anti-war sentiments, the idea that war is not heroic."). Visual images are not stripped of First Amendment protection because they express sexual messages and ideas. See Sable Communications of Cal., Inc. v. F.C.C., 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment"). And although the government may proscribe obscenity, even this kind of speech is not entirely invisible to the First Amendment. See R.A.V., 505 U.S. at 383, 112 S.Ct. at 2543 (citing Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Obscene materials, for example, may not be restricted on the basis of particularly unpopular viewpoints, ideas or perspectives. See id. at 388, 112 S.Ct. at 2545-46.

2. Speech May Not Be Restricted Simply Because It Offends
"If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989) (citing, inter alia, Hustler Magazine v. Falwell, 485 U.S. *1077 46, 55-56, 108 S.Ct. 876, 881-82, 99 L.Ed.2d 41 (1988); Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65, 72, 103 S.Ct. 2875, 2879, 2883, 77 L.Ed.2d 469 (1983); Carey v. Brown, 447 U.S. 455, 462-63, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980); F.C.C. v. Pacifica Found., 438 U.S. 726, 745-46, 98 S.Ct. 3026, 3038-39, 57 L.Ed.2d 1073 (1978); Young v. American Mini Theatres, Inc., 427 U.S. 50, 63-65, 67-68, 96 S.Ct. 2440, 2448-50, 2450-52, 49 L.Ed.2d 310 (1976) (plurality opinion); Buckley v. Valeo, 424 U.S. 1, 16-17, 96 S.Ct. 612, 633-34, 46 L.Ed.2d 659 (1976); Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302-03, 33 L.Ed.2d 222 (1972); Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289-90, 33 L.Ed.2d 212 (1972); Bachellar v. Maryland, 397 U.S. 564, 567, 90 S.Ct. 1312, 1314, 25 L.Ed.2d 570 (1970)). Restrictions on nonobscene speech based on offensiveness alone are repugnant to the First Amendment for at least two fundamental reasons. First, there is no constitutionally acceptable way to distinguish offensive speech from inoffensive speech: "[O]ne man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) (offensive speech such as a jacket bearing the words "Fuck the Draft" is protected by the First Amendment). Second, banning nonobscene offensive speech restricts protected expression based on the messages it conveys. "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." Id. at 26, 91 S.Ct. at 1788.
In Erznoznik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Supreme Court held that visual depictions of nudity at a drive-in may not be banned on the ground that they might offend passersby. Erznoznik involved a city ordinance that criminalized the exhibition of nonobscene visual depictions of "human male or female bare buttocks, human female bare breasts, or human bare pubic areas" if such depictions were "visible from any public street or public place." Id. at 207, 95 S.Ct. at 2271. In ruling that the ordinance violated the First Amendment, the Supreme Court stated:
[W]hen the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power. Such selective restrictions have been upheld only when the speaker intrudes on the privacy of the home, or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure.
Id. at 209, 95 S.Ct. at 2272-73 (citations omitted). Thus, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather ... the burden normally falls upon the viewer to `avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" Id. at 210-11, 95 S.Ct. at 2273 (citations omitted).[7]Erznoznik *1078 directly contradicts the government's assertion that nonobscene sexual expression may be restricted on the basis of offensiveness. If the government may not ban the public display of nonobscene speech on the ground that it is offensive, it stands to reason that the government may not ban the sale or rental of the same material on similar grounds.[8]

3. The Act Restricts Only Offensive Portrayals of Nudity
By its terms, the Act only proscribes the sale and rental of material that depicts nudity "in a lascivious way". 10 U.S.C. § 2489a(d). As noted above, the implementing regulations define "lascivious" depictions of nudity as those that are "lewd" and "designed or intended to elicit a sexual response." Alter Dec., Ex. A at 2. In its motion papers and at oral argument, the government asserted that "lewd" means "patently offensive," as used in the first prong of the Miller three-part test for obscenity.[9]See Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Govt.Memo") at 30; Tr. at 60-61. See also Miller, 413 U.S. at 25, 93 S.Ct. at 2615-16. Taken together, the statute and its implementing regulations prohibit the sale or rental on military property of material, the dominant theme of which may be deemed "patently offensive," if that material is presented in an audio recording, film or video recording, or a periodical with visual depictions. The Act does not apply to material containing portrayals of nudity that are not "lewd", and thus material that is not "patently offensive" may be sold or rented on military property.

4. The Government's Arguments in Defense of the Act
In an attempt to evade the principle that nonobscene speech cannot be restricted simply because its content is offensive, the government relies on two sets of Supreme Court decisions that have upheld restrictions on such speech in limited circumstances. These restrictions are confined to the context of indiscriminate public exposure, first in the broadcast media and second in schools. In Pacifica, the Court held the F.C.C. could regulate nonobscene but indecent and patently offensive radio broadcasts because of the special difficulties posed by the broadcasting medium. In particular, the Court observed that broadcast speech is "uniquely pervasive", can intrude on the privacy of the home without prior warning as to program content, and is "uniquely accessible to children, even those too young to read." See Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3039-40. Pacifica was expressly limited to the narrow context of broadcasting by Sable Communications, 492 U.S. at 127, 109 S.Ct. at 2837 (federal ban on indecent telephone messages violated the First Amendment). This rationale does not apply to military exchanges any more than it applies to a corner drug store.[10]
The government also relies on Board of Education v. Pico, 457 U.S. 853, 871, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982), in which the Court held that a school board's decision to remove nonobscene books from the school library was constitutional only because it was based on the school board's judgment that such books interfered with the *1079 educational mission of the school. Pico expressly recognized, however, that if the school board "intended by their removal decision to deny respondents access to ideas with which [the school board] disagreed, and if this intent was the decisive factor in [the school board's] decision, then [they] have exercised their discretion in violation of the Constitution." Id. (italics in original). The government also cites Bethel School District v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), to support its defense of the Act. But again, Fraser permitted the regulation of nonobscene sexually explicit and offensive speech within the context of a school environment where the audience included young children. Id. at 685, 106 S.Ct. at 3165. Both Fraser and Pico apply only to the school environment, where it has been long recognized that First Amendment freedoms are not equal to those of adults in other settings. See, e.g., Thomas v. Board of Educ., Granville Central School Dist., 607 F.2d 1043, 1057 (2d Cir.1979) (Newman, J., concurring) ("the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket"), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980).
Outside the narrow contexts of broadcast media and the school environment, the Supreme Court has never allowed the government to restrict nonobscene speech because it is "indecent", "vulgar" or "offensive". Quite to the contrary, the Supreme Court has recognized that such speech is protected by the First Amendment because it may communicate messages, ideas and perspectives that cannot be expressed otherwise. See, e.g., Cohen, 403 U.S. at 26, 91 S.Ct. at 1788 ("[W]ords are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive intent of individual speech, has little or no regard for that emotive function, which, practically speaking, may often be the more important element of the overall message sought to be [communicated].").[11]

5. The Act Violates the First Amendment
Restrictions of protected speech are subject to different levels of judicial scrutiny depending on the kind of government property to which they are applied. Government-owned property has been divided into three categories for purposes of First Amendment analysis:
(1) traditional public forums, which `by long tradition or by government fiat have been devoted to assembly and debate,' Perry Education Ass'n v. Perry Local Educators' Ass'n, [460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)], including such areas as public streets, parks and sidewalks; (2) public forums by government designation that are state-created and opened for limited public use, for example, university meeting facilities and municipal theatres; and (3) nonpublic forums which, by tradition or design, are not appropriate platforms for unrestrained communication  military installations and *1080 federal workplaces, for instance, fall into this category. Id.

Paulsen v. County of Nassau, 925 F.2d 65, 68-69 (2d Cir.1991). In either category of public forum, content-based government restrictions on speech are subjected to strict scrutiny and must be shown to effectuate a compelling state interest with the least restrictive available means. See Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. at 955-56. In nonpublic fora, however, content-based restrictions are held to a less strict reasonableness standard, and "[i]t is sufficient that rules reflect a legitimate government concern and do not suppress expression merely because public officials oppose the speaker's view." Paulsen, 925 F.2d at 69 (citing Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. at 955-56).
I need not determine whether military exchanges are public or nonpublic fora. Even in a nonpublic forum, statutory restrictions on nonobscene speech must be based on a legitimate government interest. Because the purpose of the Act is to ban expression that is lewd  under the government's plain meaning interpretation of the Act, expression that is "patently offensive"  and because the First Amendment prevents the government from banning material solely because it is offensive, the Act is unconstitutional whether a military exchange is a public or nonpublic forum.[12]
The government argues that the Act is intended to maintain the "appearance of honor and propriety and professionalism which the military seeks to establish in the community, and in the country and in the world at large." Tr. at 38. The government also contends the Act is based on Congress' determination that the sale or rental of sexually explicit materials "jeopardized the military mission of promoting core values" such as "honor, courage and commitment". Govt. Memo at 17-18. By removing Penthouse and like material from the military exchanges, the government asserts, military personnel will be more likely to "exemplify the ultimate in ethical and moral behavior." Id. at 18.
The determination of the Act's purpose must begin, of course, with the language of the Act itself. Only when a court is faced with unavoidably ambiguous statutory wording should it look behind the words themselves to legislative history in an attempt to reconstruct their purpose. See United States v. R.L.C., 503 U.S. 291, 298, 112 S.Ct. 1329, 1334, 117 L.Ed.2d 559 (1992); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395-96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (Jackson, J., concurring). As discussed above, a plain reading of the Act shows that it proscribes only those portrayals of nudity that are "lascivious". The term "lascivious" in turn is claimed to mean "patently offensive". Thus, the Act on its face bans protected speech on the basis of its offensiveness alone.
The government asserts that a plain meaning interpretation of the Act leads to the conclusion that the statute's purpose is to promote military core values and improve the public perception of the military. Arguing that magazines such as Penthouse are "unpalatable to many", the government contends that its sale and rental in military exchanges might be interpreted as an official endorsement of the material published therein. See Govt. Memo at 18 ("both military personnel and the public at large might reasonably believe that sexually explicit vulgarity sold at the base exchange bears the commander's formal blessings"). This argument is unpersuasive for several reasons. First, the Act does nothing whatsoever to reduce the actual presence of sexually explicit material on military property and there is no evidence to show that the actual sale or rental of sexually explicit material  as opposed to its possession  causes the alleged harm to the military's core values and appearance to the civilian world. Second, unless supported by Congressional findings of fact, it is unreasonable to equate the sale or rental of sexually explicit material in military exchanges with an official "endorsement". Military exchanges *1081 sell those products that are popularly demanded by military personnel, even products that may be harmful to those who buy them. It is common knowledge, for example, that alcohol and cigarettes are available in most military exchanges.
Rather, a plain reading of the Act leads inevitably to the conclusion that it was drafted in an attempt to limit the sale and rental of nonobscene speech that Congress believed to be offensive and to penalize those who publish it by preventing its sale to military exchanges. I have no quarrel with the observation that these materials are offensive  in fact, I agree that they are. But, as noted earlier, "[one person's] vulgarity is another's lyric." Cohen, 403 U.S. at 25, 91 S.Ct. at 1788. As the cases cited above in Section III(C) clearly establish, our Constitutional tradition does not allow Congress to restrict protected speech because it finds the ideas, messages or perspectives expressed therein to be offensive, vulgar or indecent. I therefore find the Act violates the First Amendment.

C. The Equal Protection Clause

Statutory classifications that burden a First Amendment right face strict scrutiny under the Equal Protection clause of the Fourteenth Amendment.[13]See Mosley, 408 U.S. at 96, 92 S.Ct. at 2290 ("Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."). See also Carey, 447 U.S. at 461-62, 100 S.Ct. at 2290-91; Bery, 97 F.3d at 699. Under equal protection strict scrutiny analysis, such a statutory classification is unconstitutional unless the government can prove that it is necessary to promote a compelling government interest. See Romer v. Evans, ___ U.S. ___, ___, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (citing Heller v. Doe, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). See also Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (citing, inter alia, Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944)). Furthermore, the government must show that the statutory classification furthers that compelling interest with the least restrictive means available. See Bernal v. Fainter, 467 U.S. 216, 219 & n. 6, 104 S.Ct. 2312, 2316 & n. 6, 81 L.Ed.2d 175 (1984) (also noting that "[o]nly rarely are statutes sustained in the face of strict scrutiny.").
While the Supreme Court has afforded Congress great deference in the area of military affairs, it is also true that Congress does not operate free of all constitutional restraint when legislating in this area. See Rostker v. Goldberg, 453 U.S. 57, 64-65, 67, 101 S.Ct. 2646, 2651-52, 2653, 69 L.Ed.2d 478 (1981). Citizens do not jettison their Constitutional rights simply by enlisting in the armed forces, and restrictions on the First Amendment rights of military personnel are subject to strict scrutiny. See Thomas v. Board of Educ., 607 F.2d at 1049 (even in the military context, "the Constitution requires governmental authorities to permit the maximum degree of unrestrained expression consistent with the maintenance of institutional integrity"). Thus, the Supreme Court has allowed restrictions of First Amendment rights in the military context only when such restrictions were deemed necessary to thwart "a clear danger to military loyalty, discipline or morale". Brown v. Glines, 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540 (1980). See also Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (upholding military requirement of a uniform dress code as essential aspect of military discipline); United States v. Albertini, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (upholding regulation that authorized *1082 commanders to permanently exclude from military base civilians who had vandalized military property as threat to preparedness and security); Greer v. Spock, 424 U.S. 828, 840, 96 S.Ct. 1211, 1218-19, 47 L.Ed.2d 505 (1976); Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (upholding conviction of a commissioned officer for conduct unbecoming an officer where, while in uniform, he publicly urged enlisted personnel to resist orders and protest the Vietnam War). Cf. Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (reversing conviction for unauthorized reentry upon military reservation where defendant had been ordered off reservation for distributing leaflets). Under the Equal Protection clause, a statutory classification that burdens a soldier's rights of free expression must face the same strict scrutiny test as any other classification that impinges upon a fundamental right. See, e.g., Rostker, 453 U.S. at 71, 101 S.Ct. at 2655 (classifications face same test in military context as elsewhere, although courts should defer to "congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance").
The Act creates classifications by banning the sale or rental of sexually explicit material that is presented in audio tapes, periodicals, and films but not sexually explicit material that is presented in books. Thus, the Act distinguishes between the nude photographs in Penthouse and those in Madonna's book entitled Sex simply because one is a periodical and the other is a hard-cover publication. Furthermore, the Act distinguishes between written and visual forms of expression, and proscribes only the latter. For example, the sale or rental of erotic literature would not be banned as long as it contained no visual images. By treating one form of publishing ideas differently than another, the Act invites strict scrutiny. See, e.g., Bery, 97 F.3d at 696, 699 (ordinance that distinguished between written and visual expression in a manner that effectively banned only one created a classification that required strict scrutiny under the Equal Protection clause).
Even were I to accept the government's claims with regard to the Act's purpose, which I do not for reasons explained above, the Act could not withstand strict scrutiny. There are no Congressional findings of fact and no evidence on the record before the Court that suggests the Act's classification is necessary to achieve Congress' alleged goals of maintaining "the appearance of honor, propriety and professionalism" and "promoting core values". Given the tremendous popularity of Penthouse and Playboy among military personnel, nothing indicates that the Act will reduce the presence of sexually explicit material on military property. Common sense indicates that publishers could evade the Act simply by selling hard-cover "books" instead of "periodicals" without changing the material published therein. Moreover, the government has presented no facts to indicate that visual versus written erotica furthers the government's asserted purpose for passing the Act. Because the Act's classifications do not further a permissible, let alone compelling state interest, and because the means the government has chosen to further that interest are not narrowly tailored, the Act violates the Equal Protection Clause.

D. Vagueness

Plaintiffs also claim the Act is vague in violation of the Due Process clause of the Fifth Amendment.[14] The standards for evaluating statutory vagueness were set forth in Grayned v. City of Rockford:
Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.... Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates *1083 basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.
408 U.S. at 108-09, 92 S.Ct. at 2298-99. The Supreme Court has also stated that these standards should not be mechanically applied. Thus, "[t]he degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment." Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). For example, enactments with civil rather than criminal penalties are given more leeway because the consequences of imprecision are less severe. See id. at 498-99, 102 S.Ct. at 1193-94. However, Hoffman also expressly stated that "the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or association, a more stringent vagueness test should apply." Id. at 499, 102 S.Ct. at 1193-94 (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (vagrancy ordinance is void for vagueness because it encourages erratic and arbitrary arrests and places almost unfettered discretion in hands of the police) and Grayned, 408 U.S. at 109, 92 S.Ct. at 2299).
As discussed above in Section III(C), government restrictions on offensive speech are inherently problematic because of the difficulty in distinguishing offensive from inoffensive speech in an objective manner. See Cohen, 403 U.S. at 25, 91 S.Ct. at 1788. In the instant case, the government has conceded that the term "lascivious" as it is used by the Act contains a subjective element. Tr. at 32-33. In this nation's pluralistic society, tastes and standards relating to the portrayal of nudity vary greatly from person to person. What one person may find to be a "lascivious" portrayal of nudity may be inspiring art to another. See American Civil Liberties Union v. Reno, 929 F.Supp. 824, 856 (E.D.Pa.1996) (terms "indecent" and "patently offensive" as used by the Communications Decency Act of 1996 are "inherently vague"). But see Shea on Behalf of American Reporter v. Reno, 930 F.Supp. 916, 935 (S.D.N.Y.1996) (finding terms of Communications Decency Act codified the FCC definition of indecency and thus were not void for vagueness), petition for cert. filed, 65 U.S.L.W. 3323 (Oct. 15, 1996) (No. 96-595). The "Review Board" established by the Act's implementing regulations[15] does not cure this defect, for there is no reason to believe that military officers will be more adept at identifying exactly what constitutes a "lewd" portrayal of nudity than any other government official.
By allowing the scope of the Act's ban on the sale or rental of portrayals of nudity to change according to each government official's distinction between what is "patently offensive" and what is not, Congress has created the real danger of ad hoc, arbitrary interpretation and application of the law. Worse yet, Congress has given military officials the means to ban the sale or rental of disfavored speech and expressive conduct under the pretext that it is "patently offensive" in their judgment. See e.g., NAACP v. Button, 371 U.S. 415, 435, 83 S.Ct. 328, 339, 9 L.Ed.2d 405 (1963) ("[A] vague and broad statute lends itself to selective enforcement against unpopular causes.").
This risk impermissibly chills plaintiffs' First Amendment rights. It is true that plaintiffs cannot be directly penalized under the Act because its effect is only to prevent military personnel from stocking their products. However, plaintiffs have a significant financial stake in their current access to shelf space in military exchanges.[16] If they are *1084 subject to a statutory prohibition of the sale or rental of "lascivious" portrayals of nudity, plaintiffs may well feel obliged to scale back their expressive conduct beyond constitutionally protected boundaries in order to maintain that access. Thus, irrespective of whether plaintiffs face the risk of direct punishment under the Act, the vagueness of its terms trespasses on plaintiffs' First Amendment rights.

IV. CONCLUSION
I am not unmindful that Penthouse and its ilk are offensive to many Americans' sense of decency. I am also aware of the military's recent difficulties involving incidents of sexual harassment and acts of violence against women. Yet if Congress wishes to restrict the sale or rental of expressive materials on military property, it must do so in a constitutionally acceptable manner. For example, Congress may choose to eliminate the sale and rental of all expressive material or all obscene material. For the foregoing reasons, I find the Act violates the First and Fifth Amendments. Accordingly, plaintiffs' request for permanent injunctive relief is granted, and it is hereby
ORDERED that, as of the date of this Opinion and Order, defendants, including their agents, servants, and employees (both military and civilian) shall be permanently restrained from changing, as a result of the Act, their existing stock, display and selling policies or practices with respect to materials that may be deemed subject to the Act.
So Ordered:
NOTES
[1] "Pornography" has been defined as "a depiction of licentiousness or lewdness" and "a portrayal of erotic behavior designed to cause sexual excitement". Webster's Third New International Dictionary 1767 (1993). The Military Honor and Decency Act bans the sale or rental of "lascivious" portrayals of nudity, which implementing regulations define as those that are "lewd" and "intended or designed to elicit a sexual response."
[2] See National Socialist Party of America v. Village of Skokie, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) (hate-mongers); R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (cross burning); Hustler Magazine v. Falwell, 483 U.S. 1018, 107 S.Ct. 3259, 97 L.Ed.2d 759 (1987) (advertisement parody of religious figure); Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (flag burning); Schad v. Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (pornographic movies); Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (nude dancing).
[3] Some House members, however, appear to disapprove of the presence of this material on military bases altogether. One of its sponsors, Representative Robert Dornan, believes Penthouse and like materials are "a frontal, direct, vicious specific assault upon women.... cheapening [them] down like slavery to a product, meat on a rack." See 142 Cong.Rec. H8824 (July 24, 1996). Representative Dornan has stated that the Act "helps the Navy to tell these guys, stop putting these graphic, gynecological exam shots up on the walls of the carrier hanger deck. Stop that.... [The Act] helps commanders to take that, not puritanical, but strong, manly, decent line, or if it is a female officer, an ethically womanly line, to not have this garbage up." Id.
[4] By comparison, amici curiae Playboy Enterprises, Inc. et al. ("Amici") sell an average of over 25,000 copies per month of Playboy magazine in all military exchanges. Amici also state that they distributed almost 20,000 videotapes through the exchange system in the first eight months of 1996. See Brief of Amici curiae in Support of Motion for Preliminary Injunction at 5.
[5] At least one issue of Penthouse has been held to be legally obscene. See Penthouse Int'l Ltd. v. McAuliffe, 610 F.2d 1353, 1372-73 (5th Cir.) (finding that the January 1978 issue of Penthouse was legally obscene), cert. dismissed, 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980).
[6] Miller defined the test for determining whether material is obscene:

The basic guidelines for the trier of fact must be: (a) whether `the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, Kois v. Wisconsin, [408 U.S. 229, 230, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972)], quoting Roth v. United States, [354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957)]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable ... law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.
Miller, 413 U.S. at 24, 93 S.Ct. at 2615.
[7] The Supreme Court distinguished Erznoznik in Pacifica on the basis that the offensive material at issue in Pacifica intruded into the privacy of the home, whereas the offensive material in Erznoznik was displayed in public. "Outside the home, the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker, requiring the offended listener to turn away." Pacifica, 438 U.S. at 749, n. 27, 98 S.Ct. at 3040, n. 27. The Erznoznik Court rejected Pacifica's other rationale  the potential, indiscriminate exposure of children to offensive material  because a ban on the public display of all nudity, as opposed to the public display of sexually explicit nudity, was over-broad. See Erznoznik, 422 U.S. at 213, 95 S.Ct. at 2274-75. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." Again, the context of public display in Erznoznik differed from that in Pacifica, where the Court expressed support for "`parents' claim to authority in their own household.'" 438 U.S. at 749, 98 S.Ct. at 3040 (quoting Ginsberg v. New York, 390 U.S. 629, 639-40, 88 S.Ct. 1274, 1280-81, 20 L.Ed.2d 195 (1968)).
[8] The public display of offensive material offends unwilling viewers or listeners. The sale or rental of such material clearly applies to those who choose to view it.
[9] See footnote 6, supra. The word "lewd" is commonly used to mean "vulgar", "lascivious", "indecent", or "salacious". See Webster's Third New International Dictionary 1303 (1993). For the purposes of this Opinion, however, I will accept the government's definition of "lewd".
[10] Moreover, military exchanges world-wide cover the front panel of Penthouse and similar magazines when they are displayed for sale. This procedure was specifically designed to prevent children from being exposed to potentially offensive magazine covers. See Alter Dec., Ex. C at 10-2 (military directive on "Selection, Display and Selling of Adult-Oriented Materials). Thus, when sold at a military exchange, Penthouse does not intrude on the privacy of the home without prior warning, and is not displayed to young children.
[11] During oral argument, the government also relied on R.A.V. in support of its claim that Congress may restrict speech because it is offensive. This argument was framed in the context of viewpoint-based speech restrictions, which target not merely subject matter but particular views taken by speakers on that subject matter. See Rosenberger v. Rector and Visitors of the University of Virginia, ___ U.S. ___, ___, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). See generally Kent Greenawalt, Viewpoints from Olympus, 96 Colum.L.Rev. 697, 700 (1996) (distinguishing viewpoint discrimination from content discrimination)). The government argued that "[in R.A.V.] the Supreme Court said you could regulate obscenity according to degree of lasciviousness. Perforce, lasciviousness cannot be a viewpoint." Thus, the government asserted, it follows from R.A.V. that even nonobscene material may be proscribed on the basis of lasciviousness.

The government's interpretation of R.A.V. is simply wrong. By its own admission, the government acknowledges that R.A.V. applies to the very different category of obscene speech, which, as a category, is excluded from First Amendment protection. See R.A.V., 505 U.S. at 388, 112 S.Ct. at 2545-46. Hence because the state may entirely ban obscenity, "no significant danger of idea or viewpoint discrimination exists ... if [the] State ... choose[s] to prohibit only that obscenity which is the most patently offensive in its prurience  i.e., that which involves the most lascivious displays of sexual activity." Id. This rationale does not apply to offensive, nonobscene material, which the state cannot ban in the first instance.
[12] The Act is a content-based speech restriction that would be subject to strict scrutiny in either type of public forum, but would be held to the less strict reasonableness standard in a nonpublic forum. See Rosenberger, ___ U.S. at ___, 115 S.Ct. at 2517.
[13] The Fourteenth Amendment does not apply to the federal government. However, the Supreme Court has long recognized that discriminatory classifications by the federal government may violate the Due Process clause of the Fifth Amendment. See, e.g., Frontiero v. Richardson, 411 U.S. 677 (1973) (federal law allowing only male members of armed forces automatic dependency allowance violates Fifth Amendment Due Process clause); Bolling v. Sharpe, 347 U.S. 497 (1954) (racial segregation in District of Columbia public schools violates Fifth Amendment Due Process clause).
[14] At least one commentator has argued that the First Amendment vagueness doctrine is distinct from the Fifth Amendment vagueness doctrine, and should be understood as a subpart of the First Amendment overbreadth doctrine. See Richard H. Fallon, Jr., Making Sense of Over-breadth, 100 Yale L.J. 853, 903 (1991).
[15] The regulations direct the defendants to establish a Resale Activities Board of Review ("Review Board"), which is to include a senior representative from each of the military branches' exchange services. The Review Board has the authority and responsibility to periodically review material offered for sale or rental to determine whether such material is sexually explicit within the terms of the Act and implementing regulations. See Alter Dec., Ex. A at 3.
[16] For example, amici assert that Playboy's military exchange sales represent approximately 2.7% of the magazine's total newsstand sales of its regular issues, and 3.6% of the magazine's total newsstand sales of its special editions. See Brief of Amici curiae, at 5.